The Court wishes to advise counsel that we have not reviewed the materials that are under the Classified Information Act, and so, as yet, we will review them, but we're in the same boat as counsel who have not reviewed them either. Thank you, Your Honor. Dennis Reardon and Donald Horgan appearing for appellate hire, Your Honor. Ensuring that a verdict in a criminal case is accurate is obviously important in every case, and doubly so in one in which the defendants received a 24-year sentence in prison. But there are some cases in which it is even more important because the verdict returned may well shape the policy and politics of our nation.  Defendant Hamid Hayat, a native-born American who had lived much of his life in Pakistan, in May of 2005 returned from a two-year trip in which he had married and cared for his sick mother. Upon returning, he's accused of having attended a jihadi camp in Pakistan and reentering this country with the intention to do violence against people and institutions. If those allegations are true, or if they're even perceived by the public as being true, they could have drastic ramifications for national policies on national security and immigration. Citizens of this country of South Asian descent could find themselves viewed with suspicion and treated with discrimination in the war on terror as they have been, as other citizens have been in the past in wartime conditions. Now, there are cases in which the evidence is so overwhelming that whatever claims of procedure or irregularity, a court can be absolutely confident that the verdict is correct. There's no question that Timothy McVeigh and Sirhan Sirhan committed the crimes that they were accused of. But in this case, the evidence is extremely disquieting. And I'm not here to urge on the Court a directed verdict of acquittal on grounds of insufficient evidence. But I think a couple of comments on the state of the evidence and background of the case are in order. The first is that it's clear from the record that the entire impetus for this case was based on a false premise. That is, we launched this massive investigation in Lodi, California, on the premise that Ayman al-Zawahiri, the second-in-command in al-Qaeda, had been there preaching in a mosque in 1999, which was an absolutely preposterous proposition. He had been indicted in the first World Trade Center bombing in 1993. Anyone who knew anything knew that he was undoubtedly in the mountains of Afghanistan at the time. But based on that false allegation by an ex-convict named Khan, ironically, we, our government, devoted several hundred thousand dollars of resources and a car given to Khan to have him run around Lodi searching out for an al-Qaeda cell. The United States attorney in Sacramento actually declared when this case was brought that there was an al-Qaeda cell there. A statement that he later admitted was untrue. But given those kinds of statements, we're dealing with the possibility of a verdict impelled by fear and innuendo rather than the truth. Number two, and this is extraordinary, if you take the statements of the defendant out of this record, if you excise them, there is absolutely no evidence that any crime was ever committed in this case. That the key allegation that Hyatt attended a jihadi camp, there's no evidence whatsoever. Although the government devoted all of these resources to the investigation, the chief FBI investigator on the stand at trial said without the statements, there's no evidence that he ever attended a jihadi camp. We turn to the statements. Again, I'm not going to ask this court to find them credible or non-credible, but we are in an era. Smith was decided by the U.S. Supreme Court in 1954. They said you have to corroborate every element of a case. You can't do it just based on a confession, because judges know what the public doesn't know, that there are often false confessions. Now we're in the days of John Vannetti Ramsey. We're in the days of DNA-proving false confessions time and time again in death penalty cases. The statements here do not inspire confidence in this verdict. I challenge the government, when it rises, to point to something in these hour-long allegations in which Hyatt, after hours of maintaining that he hadn't attended a camp, started to assent to the various suggestions and propositions advanced to him. There's no independent, verifiable evidence anywhere in these statements that the government could point to and say he said this and it turned out to be true. All right. Now let me make sure I understand. You're not contesting the fact that if he attended these jihadist camps and came back to this country, that that would violate the statute, and you're not contending that there is insufficient evidence to show, if you take all of the evidence, including the statements that were admitted, that you're not contending that the evidence is insufficient to support the finding that he did attend those camps? No, we're not making that. That's correct? That's correct, Your Honor. And we're not making that claim. A claim could have and should have been made below by trial counsel that she wasn't aware of the Smith rules for reasons we may deal with. She wasn't aware of the rule that every element of a crime has to be corroborated. She didn't make the argument below. But for the purposes of this argument, we are not suggesting that the evidence is insufficient or the allegations don't constitute a crime. What we are suggesting is that these statements would fall on the top ten list of any list for candidates for false statements. Someone who doesn't speak English very well, who ascends to propositions and will listen. And the relevance of all that to the issues you are raising is simply that it was a at most or at best a closed case and therefore mistakes matter. Exactly, Your Honor. And I add only to that the fact that the jury was not able to reach a verdict for over a two-week period of deliberations and reached an impasse. With that, let me turn to the key issue. But given all of that, and given that the Sacramento Bee in 2005, soon after this case occurred, wrote articles linking Mr. Hyatt to a real crime, which is the bombing of the London subways, there was a real possibility of a miscarriage of justice here. What do we then do? Did we get a reliable verdict from 12 fair jurors? This is conceded. The jury foreman engaged in misconduct during deliberations. That is to say, he calls up another juror. He tells her what's going on in deliberations. He says he's having trouble with another juror, Ms. Berkley-Simmons. He asked her about the ---- Now, wait a minute. Who did he call up? Alternate juror. He calls up an alternate juror who's not part of the deliberations and can't be ---- obviously can't be discussed. You couldn't discuss it. You couldn't call another juror. But you certainly can't call an alternate juror. She's been dismissed by then, right? She's been dismissed by then, has she not? Yes, yes. And she's been told not to discuss anything. In fact, the conversation is put an end to by her, not who then reports it to the judge, not the jury foreman. And so it's clearly misconduct. He's trying to get information to help him secure a verdict of conviction. He goes back after this and sends a note complaining about one of the jurors that is discussed in this conversation, improper conversation with an alternate juror. Blayton ---- and the juror that he's complaining about is a juror. He says he's having trouble with her in the conversation with an alternate juror. She is a juror who has censured him for racist comments during deliberations, racist in her view and racist in the view of other jurors, as proved by the declarations. And secondly, she is a juror who has reprimanded him during deliberations for violating another injunction of the court, which is not to be discussing media reports with other jurors, which he had done. And what the trial court does with that is that he views this simply as an issue of extraneous information reaching jurors and says, well, yes, misconduct, that's not doubted, but what information out of the conversation with Watanabe, the alternate juror, reached the jury? But whether the ---- What was the objection that was made? What was the position that was argued to him? I'm sorry, the ---- You're characterizing how he looked at it. How was he asked to look at it by defense counsel? Well, what we argue, Your Honor, is that the critical inquiry isn't whether prejudicial information reached the jury. The critical inquiry is whether this misconduct demonstrates bias such that we have at least one biased juror. Let me ask the court ---- I'm sorry. I was not clear. My question was, was that argued to the trial judge? Oh, absolutely. The bias point. Absolutely. Absolutely, Your Honor. Frankly, Your Honor, we entered the case on the new trial motion. It's the principal argument. There are dozens of cases. Is the bias that you're talking about bias with result to the result in this case, meaning not applying the appropriate standards and neutrality, or is it racial bias as such? Your Honor, let me say this. Let's assume that a foreman of a jury called up a friend and said, look, I'm having trouble with Juror X, and I'd like you to help persuade or perhaps coerce that juror into agreeing with me to convict. The friend thinks this is appalling, eventually reports it to the court, does nothing about it, okay? Does any prejudicial information reach the jury as a result of that improper communication? Absolutely not. Does that communication establish that this is a biased juror who is willing to violate the court's orders in order to get the verdict? Oh, you didn't ask my question about what bias are we talking about. Oh, well, the bias that we are talking about is a bias that we're defining a willingness to violate court orders and do improper things in order to secure the verdict that you want as an improper bias. A biased meaning towards one result rather than another. That's right. That's right. That's right, Your Honor. If someone got up in voir dire and said, you know, I'm going to do everything I can, even violate the court's orders in order to try and get a conviction for the government in this case, that would be biased. Well, this man eventually told the Atlantic magazine that he was biased in that sense. And so the question is, what does one do with that, though, when there's a finding by the district judge that he thought then, but he didn't think it earlier at the time of the voir dire? No, Your Honor. I invite that question. There is no finding by the district court to that effect. The key argues, I didn't – when he's questioned, he said, I didn't think of this until afterwards. The district court summarizes the government's position, and I direct you to the pages where this is discussed. The district court summarizes the government's position and Cody's position that he didn't form the opinion until later. But the district court does not make that finding. What page is that? The pages that we're talking about are the district court's order at pages, and I will – it's about 34 to 36, but I'll come to that. As I summarize this, Your Honor, I'll come to that specific statement. The district court does not make that finding. What it says – Mr. Worden, let me back up a little bit. Now, so far you've said that, well, this juror was biased, right? Yes. Now, what's the standard of reviewing it? Does that mean – are you saying any time anybody detects at any point in the case that a juror is biased, that's automatic reversal? Oh, if you establish legal bias on the part of the court, there's no question that one biased juror requires reversal of conviction. Absolutely not. No. What case is that? What case is that? One biased juror requires reversal of conviction. No matter when you find that out and what the bias is? If it meets the legal definition of bias in the cases of legion on that, Your Honor, including going back to Lawson v. Borg, which Judge Schroeder is familiar with, one biased juror requires reversal of a conviction. But we can't at the same time – it's all very complex and interesting because we can't inquire into their state of mind during deliberations. So, therefore, we have to inquire either into, as I understand it, whether he lied at the time of Wadier. Right. Well, see, that's what I'm trying to get at. I mean, you know, your case seems to be no matter – no matter when you detect this bias, how, at what stage of the proceeding, you know, and regardless of when that bias might have arisen, it's an automatic reversal, right? I don't understand your position.  No, let me separate – It's much too broad for me. Let me separate two critical things. I have not gotten to the Atlantic Monthly issue yet, okay, where the whole issue is – We haven't either. Right. We haven't either. Okay. But aren't they closely related? Let me just separate them in this – let me be clear before I start. If we deal with the Atlantic Monthly article, if that's critical to the Court's decision, I agree that this case cannot be – a new trial cannot be ordered because there's going to have to be an evidentiary hearing on it because the district court did not – would not let us prove that Mr. Cody made the – I'm sorry, Your Honor. Go ahead. Would not let us prove that he made the statements. He assumed he made the statements. And he said even if he made all those statements – When you made – when you say – what statement are you talking about? Well, the most critical one is he said we – we could not put this kid back on the street knowing what we know about people – Because he made a lot of statements, right? So that's a statement – okay, go ahead. Let me back up a minute to where we were a few minutes ago when I said the bias point was argued to the juror – to the judge when it was discovered that this contact had been made. Is that correct? Oh, yes. Now, what was – was there any authority cited to the judge, and what authority at that point would you cite to us for the – for the position that a juror who, regardless of the question of – of extrinsic evidence, who does something that exhibits that he may be prejudged or may be biased in the case, requires a mistrial at that point? Well, the – the – let me be clear. The claim was raised in the new trial motion. The – the – the misconduct is discovered after the verdict when Watanabe – A mistrial or a new trial? Right. It's a new trial motion, and we move – we actually entered the case at that point – moved for a new trial on the grounds of we as counsel, Mr. Horgan and myself. We had not been involved in the trial in any way. So there was no motion for mistrial at the – when this was? It was not discovered until after the verdict. After the verdict. And then the first opportunity to do it was on a new trial motion, which we made. And – and we argued that under the authority of many cases in this Court, the – the – a bias in favor of a party on behalf of a juror is the basis for a – for a new trial. Well, what if that's a bias that arises during trial? Hmm? What if that's a bias that arises during trial? Well – well, I'll stand on this. I – I agree that I haven't seen a case on this, but – but if – if during the course of the case, a – a juror becomes convinced that he wants a conviction and in order to secure that conviction, he will violate the court's order. That's a different point, then. Right. I mean, if he's in – at that point, what he has isn't a bias, but a determination on the facts. The question is how he implements it procedurally. And then – so – so that then we do get into the question of what is the impact of the extrinsic evidence. Well – well – Or the extrinsic communication. Well, let – let – Your Honor, this is very clear. I think we – let me begin with this. Watanabe called – hypothetical. Watanabe calls the – the trial judge not after the verdict, but the day that she gets this call, and – and provides him with the information that the jury foreman had called her and discussed the deliberations, okay, at that point, and was seeking information on other jurors that he wanted to use in the – in the deliberations. What would that judge have done? That juror would be off that jury in – in a second. But not – I don't think that's – I don't agree with that, necessarily. So you mean without an inquiry? No, no, no. And – and – Well, you said in a second. Well, the – I mean, to an inquiry in a second. Well, the judge calls in Judge – Ms. Watanabe. She establishes – Ms. Watanabe. Watanabe. I apologize. She establishes that the call occurred, and there's no dispute about that. But the reason wouldn't be because of bias. The reason would be because he isn't following the judge's orders. Because of the ex parte contact. Yeah. Right. And – and because the ex parte contact establishes that this is not a juror who is capable of reaching a fair and impartial verdict as a result of – Oh, not necessarily. Well, maybe it is and maybe it isn't. But, you know, you make the inquiry, you know. The judge is supposed to determine that, right? You know, I thought you were going to say something else entirely, or maybe not. Yeah. With regard to this issue, which is that he asked about what – he was worried about one juror. And this woman then says, no, no, no, the real problem is this other juror. And then he – who he said was really terrific, and then the next day he goes off after the other juror. Exactly. Exactly, Your Honor. I mean, that is true. He's receiving – But that is a prejudice based on actual communication. That is. It's a prejudice. That's correct. And it's information received by – by the foreman concerning the information that he didn't know, which is the opinion and interaction that this other juror had with Jura Lopez. And as you say, he moves to kick her off the jury the next day, and the description of what occurs follows from that. Can I deal with the Atlantic Monthly question? Yeah, quickly. You only have half a minute, and I think you should deal with this, you know, this objection to the – here's the objection. Well, thank you, Your Honor. I'll deal with what the Court suggests that I deal with. Let me say this. In the ruling of the – let me just say that the ruling on the Atlantic Monthly article, Your Honors, is at pages 15 to 18. The Court doesn't find that the – make a factual finding that the attitude was beforehand. He just says that the Atlantic Monthly article doesn't prove bias, which I think is wrong as a matter of law. Let me say this, Your Honor. On the hearsay question, this is – the judge, when he deals with this on the new trial motion, doesn't say it was an error to let it in. He says, I can view it as plain error because there wasn't an offer of proof. You don't need an offer of proof on cross-examination. That's what Alford says in the United States Supreme Court. Secondly, there are questions that are an offer of proof. If in the self-defense case you say, you were the one who shot the defendant, not my client, you don't have to make an offer of proof. If you don't know what the answer is, how do you know what the answer is? Well, if that were true – Isn't that why you need a proper? But, Your Honor, your answer – your seeking – the answer you're seeking is obvious. In this case, didn't my client tell you he never intended to go to the camp? Yes. You can't possibly – you can't – I mean, the answer – it's an offer of proof. I want a yes answer to that question. You can't possibly establish the answer on cross-examination, because if that were the case, no cross-examination violation would ever be prejudicial, because you never got the answer that you seek. Well, I know, because you don't know the answer, because that's why I asked the question. You can't know the answer. I mean, you can't prove the answer. What – are you arguing a constitutional violation he asked? Absolutely. So you're essentially arguing, as I understand it, even if it's here, say, that it was so central under Chambers and so on that it had to – that it was constitutional error not to admit it. Is that what you're arguing? We're certainly arguing that this was an answer that he had a constitutional right to – to proffer. It wasn't – it wasn't an answer – it was a statement of his mental state which was admissible, and my time is up. Let me just state this about prejudice. But mental state meaning his prejudice. And it's this. This case, again, we're going to a new trial motion. We said there's no evidence of – they have to prove independent evidence from his own statements of mental state. The one piece of evidence that the judge cites in his order as proving mental state, independently of the defendant's statements, is the testimony of Mohammed, who says, oh, if you carry a piece of Arabic around in your pocket, then I know as an expert that you're obviously a jihadi terrorist, which was junk testimony of the First Order. This was the key rebuttal to it. This was the most important question asked during the entire trial by the defense as to the mental state of the defendant. And he had a right to ask it. It would have been enormously exculpatory. And to let the conviction rest on this junk about I can predict what's in somebody's mind who doesn't speak Arabic by looking at an Arabic instruction, even though I know nothing about Urdu or Pakistan, was nonsense. All right. Thank you. Roberts. May it please the Court. Good morning. My name is Robert Tice Raskin, and I'm arguing the cause on behalf of the government. The fundamental question before this Court, did Hamid Hayat receive a fair trial in the government's measured judgment? He did. Let me start with a preliminary question, issue rather, reference the jury bias misconduct claim. I think it is important to remember the standard of review here. It is an abuse of discretion standard. I do note that in Hayat's reply brief, he cites the Lopez-Martinez case, suggesting that it is a de novo standard. I would urge this panel to look closely at the Lopez-Martinez case. What it will find is that that case actually miscites the SIA case, which precedes it. Lopez-Martinez does indeed suggest a de novo standard and cites to SIA. When you go back to SIA, SIA makes it clear that a de novo review is applicable for a claim of jury exposure to extrinsic evidence framed as a constitutional violation of a Sixth Amendment right to confrontation. And the SIA case then goes on to say that in a case such as ours, where it's a denial of a motion for a new trial based on allegations of misconduct, the standard is indeed abuse of discretion. Now, let me turn to the incident between Foreman Cote and alternate Watanabe. Now, I agree that it was inappropriate and violative of the Court's order for the foreman to contact the alternate. I do agree with that. But I would also suggest to the Court is two things. First of all, as the district court found, there was absolutely no showing of prejudice whatsoever. Well, is that the legal standard that applies to that type of contact? It has to be prejudicial. Indeed, if it is an ex parte contact, which the government contends that it was because it did not bear on the merits of the case, there was no discussion of the facts, there was no discussion of the law. So if it is indeed an ex parte contact, as opposed to an instance of extrinsic evidence, then there must be actual proven prejudice before that ex parte contact will require any sort of... But this essentially was a request for strategic help in how to get the verdict that he wanted. That's why he was calling her, right? Well, Your Honor, I don't think there is evidence in the record to support that suggestion by the defense. And I would like to address that directly. What else was he doing? Yes, that seems to be the fair inference. Well, Your Honor, Your Honors, the bottom line is we do not know the exact reason for the call. I know. However... So we have to make some kind of reasonable inference. What other reasonable inference is there as to why he did that? Let me make a suggestion to answer the Court's inquiry. But first let me talk about one important point, which is the defense, they assert that the foreman contacted Watanabe in an effort to undermine the position of jurors who resisted his views, and they suggest that that contact took place on April 20th, way down the road during the course of deliberations. That date that the defense suggests I do not believe is supported by the record. And in fact, if this Court closely inspects the record, it will see that Ms. Watanabe makes no statement as to when that contact took place, and Mr. Cote does seem to place it in time. Now, this is Mr. Cote's statement as related to the Court through the declaration of James Weddick. But what does Mr. Cote say as far as the timing is concerned? He says that it took place one day after deliberations began by... So what? Well, so first of all, the inference that the defense wants to suggest is that this took place way down the road in deliberations after there was an impasse, and that is the only reason that the foreman would have contacted this alternate... Whether it was earlier or later, I mean, it might have some – what you're saying might have some impact on my hypothesis that it does appear that there was an immediate effect of this. But it wouldn't have any impact on the question of why he was doing this. It still could only be for strategic reasons to help him understand how to get the verdict he wants. Your Honor, Mr. Cote, and indeed, Watanabe, indicated that Mr. Cote had not made  He had said that Berkley Simmons had been causing some trouble. There's no indication specifically in the record as to what that trouble was. But let me make this suggestion to you. For all we know, the entire trouble that Watanabe was referring to or that Cote was referring to was the whole incident related to Ayman al-Zawahiri. Remember this, Your Honor, and we do know this from the statements of the jurors. There apparently was a huge debate among the jurors regarding Nassim Khan and his purported misidentification of al-Zawahiri. There was a debate among them, as there was between the parties, as to whether that was an innocent misrecollection, as the government suggested, or was some nefarious effort on Nassim Khan's part to con the FBI into bringing him in. And as the Court will also recall, during that, what was apparently a heated discussion among the jurors, that's when Mr. Cote made the unfortunate remark that if you dress them all the same, they look the same. I would suggest to you, Your Honors, that the only credible evidence that is actually in the record, speculation aside of the defense, the only credible evidence of what the trouble was was the trouble in connection with the discussion of that incident. Now, I do not believe that this incident in isolation can be viewed in any way, shape, or form as a suggestion that this foreman held a disqualifying bias based on racial animus or religion or anything of the sort against the defendant. I just don't believe there is a reasonable objective inference that can be drawn there. I also don't believe that the fact that this – that the foreman admittedly did violate the Court's directives can be taken as some sort of indication that the foreman was hell-bent on securing a conviction by any means possible and strong-arming all the jurors into seeing the case his way. And I do believe that when you indeed look at some of the other evidence that's in the record, there are – there are objective suggestions that this jury – Sotomayor, let's just suppose that during the deliberations he did try to do – and he tried to get them to see things his way. There's nothing wrong with that. Absolutely not, Your Honor. Once the case has been submitted to the jury, they've seen all the evidence – Seems to be suggesting that there is some problem with the juror going into deliberations committed to what he thinks is the proper view of the case. I'm sorry, Your Honor. I didn't hear your last comment. You seem to be suggesting that there's something wrong if the foreman goes in having a view of the case and trying to convince the other jurors that they should agree – that they should see it the same way. What a juror ideally should be doing, Your Honor, is, as the Court instructs, trying to keep an open mind till the end, considering all the evidence. And then once it's in – Yes, but we're talking about during the deliberations. That's what – all right. Can I – And that's true, Your Honor. I mean, once the deliberative process has begun, then the juror must do what the juror is there to do, which is to weigh the evidence, to follow the law and to reach his conclusions and – Okay. But once the juror violates the rules and contacts somebody else and then uses that information that he gets from somebody else in the deliberations, isn't there a problem with that? I could see how there could be a potential problem, but there is no indication in this record. There is no indication in this record that that's what the foreman, in fact, did. For all we know based on the record, he contacted the alternate. He inquired – He was not a party to the deliberations. Absolutely. He just watched the trial like anybody else. And for all – all we know is that he contacted her. They had this discussion about two of the jurors, and then the conversation ended. And there is no evidence in the record to suggest that the foreman then somehow took the information from the contact back into the jury room and in any way infected the deliberative process. That's – But he did – we know, I mean, there is a connective there. He did send a note to the judge complaining about the juror who she said was the problem. Your Honor, actually, that's why the timing is important, because that's why the note came towards – I mean, it's a better reference if the timing is close than it's far, but it's still true that it happened. Well, and – well, Your Honor, there was indeed a point in time in which a note was sent back, but I don't believe – But we don't have a finding about that, right? We have two different representations about when this occurred, and we don't have a finding about when it occurred, do we? We do not have a finding by the Court. However, the record is undisputed. We have one recollection from one juror with no date and one recollection from another juror with a specific date. I thought she had a date. No, not to my knowledge. We know when she reported it to the judge, though, right? Pardon me, Your Honor? No. Don't we know when she reported it to the judge? This was all post-verdict, Your Honor. It was – now, I'm talking about – She didn't report it to the judge until post-verdict? That is the – I thought we were told just before that she reported it the very next day. We're talking about the contact by alternate – the foreman with alternate – Adenovic. Alternate Watanabe. Your Honor, that's not my recollection of the record. My recollection is that this entire ex parte contact did not come to light until post-verdict. Could we go on to the Atlantic Magazine article? It seems to me – I mean, would you agree that if he had said these things in Voisdier, he'd be also jury in 36? I think that if he had said these things in Voisdier, the judge would have appropriately had to immediately follow up with him and ask him the question, okay, you have said these things. Now, are you able to honestly set those sentiments and that knowledge aside and are – It wasn't knowledge and sentiments. It was a view – a definite statement that essentially I'm not going to apply a beyond a reasonable doubt standard, and I'm going to – because I'm going to favor the government of – if things are unclear. Now, Your Honor, if during Voisdier a juror said, I'm rooting for the government, I'm going to favor the government, I'm not going to apply the applicable standard, I agree with you. There would be cause to remove. And do you know the reason for having said that after the – in this article? The significant point here, Your Honor, is that, first of all, the evidence before the court was that the foreman indicated that he did not have any of those thoughts in his mind prior to the – I understand that. I wanted to get to that, but I want to first know if he had said these things during Voisdier, is there any doubt – well, if he harbored these views during Voisdier and the judge knew it, is there any doubt that he would be off the jury? Your Honor, I think it honestly depends on the particularized statements and whether or not – The statements, the ones that he made then. If, Your Honor, if the – if Cote had indicated that he would favor the government, that he would disregard the burden of proof, and that he would convict this defendant solely based on his nationality or religion, yes, there would be cause for him to be disqualified, without doubt. Let's get the nationality and religion out of it for now. Aside from that, he said, I'm going to shave all doubts in favor of the government giving the stakes here. That's what he said. Your Honor, and that's where I would beg to differ. And the reason is this. The juror definitively informed the court, the district court, and the district court credited his testimony that he did not have any of these thoughts in his mind prior to the time of deliberations. So that's really the question, ultimately, because Mr. Reardon says that the district court never really resolved that question. And looking back at the statement in the order, what I see him saying is this, that these statements don't prove that he had that opinion at the time. But he doesn't really ultimately decide whether he had that opinion at the time, using these as evidence, rather than as self-standing, you know, the sole indication. Your Honor, the juror under oath affirmatively, in connection with the questions put to him by Judge Burrell, testified that he did not have those thoughts. And moreover, and moreover, to answer the question about findings, the district court did enter a finding in its order specifically crediting the testimony. Kagan All right. Where's that? That's what I'm looking at. Gershengorn Your Honor, I would have to leaf through and find that for the Court. I'd be happy to do so if I may, at the close of proceedings, I can provide that to the deputy clerk for the Court's use. Because of that key fact, Your Honors, I don't believe it is inappropriate for a juror, after the case has been submitted to him, after he's submitted the evidence, after he's seen the evidence, after he's heard the law, to then begin formulating his view of the case. And if his view of the case is indeed that, I believe the government is right here, there's nothing wrong with it. Kagan But that is not what he said. It is not what he said. So the question then is, if we don't have a link back to the voir dire, but we do have him saying shortly after the trial, as I read it, I'm not going to apply the beyond 606, and there's nothing we do about it? Goldstein, Well, Your Honor, there's a couple of things there. First of all, I do believe there is a 606b bar if this Court concludes that those statements are not reflective of a bias, of impartiality. If the Court believes, however, that 606b does not serve as a bar and wants to reach the merits directly, I would suggest to the Court that given the context in which those statements were made during either during deliberations or even these thoughts might even reflect the thoughts of the juror post-verdict trying to explain what the rationale was of himself and the jury after the fact. I believe that even if you look at it from either of those perspectives, it does not prove actual bias and inability on the part of the juror to be impartial during the course of the trial. If the Court has further inquiries referenced the bias misconduct issue, I'd be pleased to stay with this topic. Otherwise, I know the Court did raise some questions referenced the cross-examination, and I would address that if it pleases the Court. Now, the defense didn't address which of the two cross-examination issues in the case it was speaking to. I assume that he was addressing the statement by Hyatt that Hyatt never intended to go to a training camp and was lying all along. First of all, this is a plain error standard. This was not raised at trial at all by trial counsel. Kennedy, what do you mean? He asked a question. Yeah. No. Of course, the question was asked. The question was asked, but at no point in time did trial counsel suggest to the district court that this was potentially admissible under a 8033. You don't have to take an – it's no longer required to take an – make an exception after your objection has been, you know, sustained. That's, you know, archaic practice. It is required under Ninth Circuit law for there to be some sort of foundational requirements to establish that that particular statement would have been admissible under that particular hearsay exception. And the fact of the matter is – What do you mean by you got to show that to the district court during cross-examination? You have to somehow lay some sort of foundation that the statement is being offered in order to prove the – What case says you have to do that in this context? Your Honor, I would point the Court to the Poncecelli decisions and the Emert decisions, which indicate that before a statement is to be admitted under Rule 8033, that the proponent must establish the three factors. They must establish that it was contemporaneous, they must establish that there was no chance for reflection, and they must establish relevance. And the thing here is, the important thing here is – I don't understand why it has to be admitted under that exception or even any other particular exception, as opposed to simply the – essentially directly under the Confrontation Clause. And here you have a witness who said he – at one point he says, I have no reason not to believe that he was going to do what he said. If this statement were said to him, then at least he had a reason not to believe what he said, and therefore he was not credible. So simply on basic cross-examination grounds, why don't you get to do it? Your Honor, you still have to have a non – you have to satisfy the hearsay question. Okay? This is – Why? Why? Because – Why? Because – Directly under, you know, a rule exception. Your Honor, it was not. Because in the government's view – in the government's view, what was going on here was – it was a statement – let me give some background here. The hearsay declaration of issue would have been a statement by Hyatt on October 7th, 2003, that he never intended on going to a camp and that he was lying to Kahn all along. Now, the context is – Is that statement directly relevant to the credibility of the witness, Kahn, as to his representations that he had no reason not to believe what this guy was saying in general about going to a jihadist camp? It's certainly relevant, but that still doesn't address the hearsay issue, which I want to – But that's not really hearsay at that point. It's simply a question of whether something was said to him that affected his state of mind that he was lying about. So it's not hearsay. Your Honor, what the Proffitt statement on October 7th essentially was attempting to do was to retract previous statements that had been made by Hyatt when Hyatt had spoken with Kahn and professed his desire – But you're not answering my question. On my hypothesis, it doesn't seem to me it's even hearsay. Your Honor, I would disagree with the Court's hypothesis. Why? I do – because it is an out-of-court statement that is being offered by Hyatt purportedly to represent his present state of mind. Not necessarily. It's to represent whether Kahn was telling the truth in his overall testimony. Your Honor, it was never – that purported basis was never put before the Court. So it's – and I cannot believe that that would have been clear or should have been clear to the district court at the time that it was being offered for that purpose. I'm sorry? It was cross-examination. And he had said X, and now they're saying, but you said X, but didn't you also know why? What's so complicated about that? Your Honor, I believe that it would still constitute inadmissible hearsay unless the – Let me understand that, because we've got to go here. The question was asked, is that correct? The objection was made? A hearsay objection was made. It was sustained. Correct, Your Honor. Was there any – is there anything to indicate that the judge – that the prosecution wanted the judge to know that this was not – that the question or that the examiner, the cross-examiner, was asking this only for the purpose of finding out whether that statement was made, not for the truth of it? The defense at no point in time – this was defense cross-examination – at no point in time did they suggest to the trial court that it was being offered for a non-hearsay purpose. They did not. And I would suggest that under a clearly erroneous standard, you can't fault the district court for not, on the spot, coming up with a variety of different theories, any which – Also, there was a context here, which is, just previously, or fairly just previously, the – she had tried to ask a question which clearly wasn't hearsay, it seems to me, which was, didn't you say in your direct examination, X, and the district court – and there was a hearsay objection, and he sustained it. So at this – that point, and there was a discussion there where she said, I'm really not doing that, and he said, I don't care, you can't do that. So there was no point in continuing to argue about it. Your Honor, I think that, frankly, those two issues, there was some separation in time in connection with the cross-examination, such that it would have been futile. I'm sorry. Five or ten pages, I think. I mean, not much. A couple minutes. I don't think it would have been sufficient such that the defense should have thrown up its arms and not stated any basis to the court as to why it would be admissible. We will read the transcript. Are there any further questions of Mr. Reardon? Thank you. Thank you, Your Honor. The case just argued is submitted for decision. Could you give it to the clerk, and he will give it to us. Thank you. And provide counsel with copies. Thank you. The case just argued is submitted for decision, and that concludes the Court's hearing this morning. The Court stands adjourned.
judges: Schroeder, Tashima, Berzon